UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MUSKEGON CENTRAL DISPATCH 911,

    Plaintiff,

v.

TIBURON, INC.,

    Defendant.
_____/

CASE NO. 1:08-CV-550

HON. ROBERT J. JONKER

## OPINION

This case arises out of an arbitration decision in a software contract dispute. In the underlying arbitration, Muskegon Central Dispatch 911 ("MCD")[1] claimed that Tiburon, Inc. ("Tiburon") had materially breached a System Implementation Agreement ("SIA") between the parties, and MCD sought damages for the alleged breach. Tiburon denied that it had breached the SIA. Instead, Tiburon asserted that MCD had terminated the SIA without cause, and claimed damages under a provision of the SIA governing termination for convenience. The Arbitrator decided the dispute in favor of Tiburon based on his conclusion that MCD failed to follow the contract's dispute resolution procedure. The Arbitrator never reached the merits of the parties' substantive disputes, but he denied all MCD's claims for damages, and awarded against MCD essentially all the damages Tiburon requested. Through cross-motions, MCD now seeks vacatur of

---

[1]MCD is a consortium of eleven police agencies, fifteen fire agencies and two emergency medical service agencies, all in Muskegon County, Michigan, sharing a common emergency response system. (Second Am. Compl., docket # 20, ¶ 5.)

the Arbitrator's decision, while Tiburon seeks confirmation of the Arbitrator's decision. (*See* docket ## 27, 35.)

## Background

**1.      The parties enter into the System Implementation Agreement.**

On December 30, 2003, MCD and Tiburon entered into the SIA, under which Tiburon was to create and implement for MCD an integrated automated public safety system that would include, among other things, a computer-aided emergency dispatch system, police and other records management systems, and connection to the Law Enforcement Information Network. (Br. in Supp. of Mot. to Vacate Arbitration Award, docket # 36, at 3.) The SIA includes a detailed, multi-step process for the informal resolution of disputes between the parties (the "DRP"), providing as follows:

> 12.      Informal Dispute Resolution
>
> 12.1.  The parties to this Agreement shall exercise their best efforts to negotiate and settle promptly any dispute that may arise with respect to this Agreement in accordance with the provisions set forth in this Section 12.1.
>
>> (a)  If either party (the "Disputing Party") disputes any provision of this Agreement, or the interpretation thereof, or any conduct by the other party under this Agreement, that party shall bring the matter to the attention of the other party at the earliest possible time in order to resolve such dispute.
>>
>> (b)  If such dispute is not resolved by the employees responsible for the subject matter of the dispute within ten (10) business days, the Disputing Party shall deliver to the first level of representatives below a written statement (a "Dispute Notice") describing the dispute in detail, including any time commitment and any fees or other costs involved.
>>
>> (c)  Receipt by the first level of representatives of a Dispute Notice shall commence a time period within which the respective representatives must exercise their best effort to resolve the dispute. If the respective representatives cannot resolve the dispute within the given time period, the

dispute shall be escalated to the next higher level of representatives in the sequence as set forth below.

(d) If the parties are unable to resolve the dispute in connection with the escalation procedures set forth below, the parties may assert their rights under this Agreement.

| Escalation Timetable Business Days | Tiburon Representative | Client Representative |
|---|---|---|
| 0 to 5th | Project Manager | Project Manager |
| 6th to 10th | Operations Manager | COPS Coordinating Committee Chair |
| 11th to 15th | Executive Officer | Chairman of COPS Board |

(*Id.*, Ex. 4, SIA, at § 12.)

The SIA provides two means of terminating the contract, one for cause, the other without cause. (*Id.* at §§ 13.1, 13.2.) Section 13.1, concerning termination for cause, provides:

> Subject to completion of the dispute resolution procedure set forth in Section 12.1 hereof, in the event that either party hereto materially defaults in the performance of any of its obligations hereunder, the other party may, at its option, terminate this Agreement by providing the defaulting party thirty (30) days' prior written notice of termination.

Section 13.2, concerning termination without cause, provides that "[t]he Client may terminate this Agreement without cause by providing Tiburon at least thirty (30) days' prior written notice of termination delivered in accordance with Section 33 hereof." Section 13.2 details consequences of termination. Among other things, it provides that if MCD terminates the SIA without cause, MCD must pay Tiburon "for all outstanding invoices submitted . . . prior to the effective date of the termination and for all costs and expenses incurred prior to the effective date of the termination." (*Id.* at § 13.2.) Nothing in Section 13 of the SIA treats these termination provisions as exclusive remedies. Indeed, the parties' own agreement acknowledges this. (*See id.* at § 13.5.)

3

### 2. Conflicts arise between the parties and elude resolution.

According to MCD, delays and other performance problems arose soon after Tiburon started work on the project and worsened over the course of approximately two and a half years. (Br. in Supp. of Mot. to Vacate Arbitration Award, docket # 36, at 6-18.) MCD states that Tiburon postponed the implementation dates of key system features multiple times without MCD's consent and that Tiburon was unable to deliver several fundamental system functions it had agreed to provide. (*Id.* at 7-10, 14-17.) MCD contacted Tiburon repeatedly to express concern about project delays, turnover among project managers, a perceived lack of responsiveness, and unavailable system functions. (*Id.* at Exs. 9, 10, 11, 14, 16, 29.) In correspondence with MCD via electronic mail dated August 18, 2005, the Tiburon project manager then in charge of the project acknowledged that "the progress of the implementation has been very slow if any," and stated that "the resources will be allocated to getting [the MCD project] back on track and bring [sic] closure to the [SIA] and new system." (*Id.* at Ex. 9.) However, MCD asserts, the situation did not improve. Indeed, in an internal electronic mail dated August 4, 2006, a Tiburon project manager newly assigned to the MCD project outlined a series of MCD's concerns and stated, "[i]n reviewing the contract [with MCD], we are clearly in material default." (*Id.* at Ex. 32.)

On August 25, 2006, MCD through counsel notified Tiburon that it was terminating the SIA for cause. (*Id.* at Ex. 37.) In response, Tiburon's president, Gary Bunyard, sought a meeting with David McCastle, MCD's executive director. (*Id.* at 19.) Messrs. Bunyard and McCastle, along with several other representatives of Tiburon and MCD, met on August 28, 2006 to attempt to resolve the companies' differences. (*Id.*) The meeting yielded no resolution. On November 2, 2006, Mr. Bunyard, citing the DRP, requested a meeting with the Central Operations Police Services Board

("COPS"), which controls MCD. (*Id.* at 3 and 19.) The COPS board met with Mr. Bunyard on December 4, 2006. (*Id.* at 19.) After the meeting, the COPS board chairperson and Mr. Bunyard had two additional telephone conferences. (*Id.*) Nonetheless, the conflicts remained. On December 21, 2006, MCD through counsel notified Tiburon that it was terminating the SIA. (*Id.* at Ex. 40.)

      3.     **Tiburon initiates arbitration.**

On February 28, 2007, Tiburon initiated arbitration by filing a demand with the American Arbitration Association. (*Id.* at 19 and Ex. 41.) After that initial filing, the parties decided to use a private arbitration process, entering into an Agreement to Submit to Private Arbitration (the "Arbitration Agreement") on June 2, 2007. (*Id.* at 19 and Ex. 42, Arbitration Agreement.) The Arbitration Agreement requires the Arbitrator to apply Michigan law to the dispute. (Arbitration Agreement at § 3.) It also provides that "[j]udgment upon the [Arbitrator's] decision may be entered in any court that has jurisdiction over the parties, in accordance with the Michigan Arbitration Act . . . Appeals from the arbitration award shall be conducted as provided for in MCL 600.5001, [et] seq. and MCR 3.602, as amended from time to time." (*Id.* at § 18.)

Both parties signed the Arbitration Agreement and proceeded to arbitration. Neither party objected at the time they agreed to private arbitration that the other party had failed to exhaust the informal process of the DRP. In the arbitration, Tiburon filed a Statement of Claim seeking $456,662.97 under Section 13.3(d) of the SIA. (Br. in Supp. of Mot. to Vacate Arbitration Award, docket # 36, at 20 and Ex. 43.) MCD denied liability and also counterclaimed, alleging breach of

5

contract, among other counts. (*Id.* at 19 and Ex. 44.)[2] MCD sought restitution for the amount paid under the contract, $516,104.03, as well as certain costs and expenses. (*Id.* at 20-21 and Ex. 44.)

### 4. The Arbitrator's Decisions

A bifurcated trial took place before the Arbitrator. On April 25, 2008, the Arbitrator ruled in favor of Tiburon on the issue of liability. (*Id.* at 21 and Ex. 46, Arbitrator's Op. on Liability, at 9.) The Arbitrator's analysis rests on the premise that MCD could seek damages for material breach of contract only through the termination provisions of Section 13 of the contract. That section provides for termination for cause in Section 13.1, or for convenience, in Section 13.2 of the SIA. (*See* Arbitrator's Op. on Liability at 2, 9.) The Arbitrator further found that to terminate the contract for cause under Section 13.1, a party must first comply with the DRP. (*Id.* at 3.) He recognized that the DRP did not "specifically identify which party has the responsibility to initiate the escalation procedures contained in Section 12.1(d)," even though the DRP was otherwise "clear and unambiguous." (*Id.* at 4.) Nevertheless, the Arbitrator went on to assign the responsibility to one party — MCD in this case. (*Id.*) The Arbitrator then determined that MCD failed to satisfy the escalation timetable requirements of Section 12.1(d). (*Id.* at 9.) He concluded that MCD did not terminate the SIA for cause and that its only other option was termination for convenience without the opportunity to claim damages for any material breach by Tiburon. "Since . . . MCD has not met its obligations under Section 12.1 of the SIA, MCD's termination of the contract will be considered a termination for convenience." (*Id.*) Following the damages portion of the trial, the Arbitrator on November 19, 2008 awarded Tiburon damages "in the amount of $452,579, together with interest

---

[2]In a decision not at issue in this case, the Arbitrator dismissed all of MCD's claims other than the breach of contract claim after a hearing on dispositive motions. (*Id.* at 21 and Ex. 45.)

running at the statutory rate allowed under Michigan law, and taxable costs." (*Id.,* Ex. 48, Arbitrator's Op. on Damages, at 9.) This was essentially all the damages Tiburon had requested. MCD recovered nothing.

In neither his opinion on liability nor his opinion on damages did the Arbitrator address the merits of MCD's breach of contract claim. Indeed, the arbitrator never made any findings on whether Tiburon breached its own contractual obligations, as MCD claimed, and as Tiburon's own project manager believed. Instead, the Arbitrator treated what he found as MCD's failure to comply with the DRP, coupled with the termination provisions, as essentially a forfeiture of MCD's right to assert breach. The Arbitrator's decision resulted in MCD losing entirely and Tiburon winning entirely, without any finding on whether Tiburon was in material breach of substantive obligations.

After termination of the SIA, MCD engaged a new vendor to finish creating and implementing the automated emergency response system. The project is now complete.

**Legal Standard**

The Michigan Arbitration Act and Michigan Court Rules, not the Federal Arbitration Act, govern this case, consistent with the parties' Arbitration Agreement. (*See* Arbitration Agreement at § 18.) M.C.R. 3.602 requires a court to vacate an arbitration award upon a proper motion if, among other things, "the arbitrator exceeded his or her powers" or "refused to hear evidence material to the controversy." (M.C.R. 3.602(c),(d).) Under Michigan law, arbitrators "exceed their power whenever they act beyond the material terms of the contract from which they primarily draw their authority, or in contravention of controlling principles of law." *Detroit Auto. Inter-Insurance Exch. v. Gavin*, 331 N.W. 2d 418, 430 (Mich. 1982). Arbitrators "derive their authority from the parties'

7

contract and arbitration agreement . . . [and] are bound to act within those terms." *Gordon Sel-Way, Inc. v. Spence Bros., Inc.*, 475 N.W. 2d 704, 710 (Mich. 1991) (citing *Gavin*, 331 N.W.2d at 418).

In determining whether an arbitrator has exceeded the scope of his or her authority, courts apply a stringent standard:

> Where it clearly appears on the face of the award or the reasons for the decision as stated, being substantially a part of the award, that the arbitrators through an error in law have been led to a wrong conclusion, and that, but for such error, a substantially different award must have been made, the award and decision will be set aside.

*Gavin,* 475 N.W. 2d at 434 (quoting *Howe v. Patrons' Mut. Fire Ins. Co. of Michigan*, 185 N.W. 864 (Mich. 1921)). A reviewing court may not reinterpret a contract, decide contract disputes submitted to arbitration, or change an award for reasons going to the merits of the claim. *Gordon Sel-Way*, 475 N.W. 2d at 712. Rather, an error warranting vacatur "must be evident from the face of the award and 'so material or so substantial as to have governed the award, and but for which the award would have been substantially otherwise.'" *Id.* at 710 (quoting *Gavin*, 331 N.W. 2d at 418).

The legal standard for determining whether an arbitrator exceeded the scope of his or her authority is demanding, but not insuperable. A court reviewing an arbitration decision "is not a procedural pass-through bureaucracy which may, by agreement of private disputants, be used to validate patently erroneous arbitration awards." *Gavin*, 475 N.W. 2d at 430. On the contrary, "[i]f the appellate judiciary has any proper function at all, it is to correct material error." *Id.* Courts may not "give parties the use, and benefit, and authority of the state's judicial process which exists *solely* to interpret and apply the law by giving effect to an argument to ignore the law." *Id.* (emphasis in original).

MCD meets the high standard required for vacatur. As *Gavin* points out, in agreeing to arbitration, the parties' central focus is the benefit of the bargain they entered – the substantive terms of the agreement – not process. *Id.* at 427. Where parties to a contract provide specifically for the use of arbitration to resolve significant disputes, "it is clear that the primary concern of the parties is the enforcement of the terms of the agreement which they have made, securing to each of them the benefits to which they are entitled under the applicable law, including their own agreement." *Id.* Of secondary concern are the procedural mechanisms by which disputes will be resolved. *Id.* "The process of dispute resolution and the procedural advantages of arbitration are the servants of the law governing the issues in dispute, not the reverse." *Id.* *Gavin's* reasoning applies not only to the ultimate arbitration process, but also to the preliminary dispute resolution steps leading to the eventual arbitration. In this case, the Arbitrator never actually decided the core dispute on the merits: namely, whether Tiburon materially breached its contractual obligation. Yet without deciding this core dispute, the Arbitrator declared Tiburon the total winner and MCD the total loser. The basis of his award was entirely procedural and was plainly not what objectively reasonable parties could have anticipated from the contract they crafted. Accordingly, the Arbitrator's decision cannot stand.

**Analysis**

1. **The DRP of Section 12 imposes mutual obligations that are the servant, not the master, of the substantive contract obligations. *Gavin*, 475 N.W. 2d at 427.**

There was no basis in the language of the contract for the Arbitrator to allocate responsibility for proceeding through the DRP to a single party. The plain language of the DRP contemplates mutuality of obligation. It states, for example, "[i]f *the parties* are unable to resolve the dispute in accordance with the escalation procedures set forth below, *the parties* may assert their rights under

9

this Agreement." (SIA at § 12.1(d) (emphasis added).)  The DRP speaks in the plural, requiring the parties, not just a single party, to attempt to resolve a dispute in accordance with the escalation procedure.  (*See id.*)  The Arbitrator conceded that the DRP "does not . . . specifically identify which party has the responsibility to initiate the escalation procedures." (Arbitrator's Op. on Liability at 4.)  But the Arbitrator nevertheless concluded that a single party must bear the burden of initiating each step of the escalation process.  *Id.*  In assigning the burden to only one party, the Arbitrator read his own additional terms into the SIA.  The DRP itself does not place the burden to move the process along solely with one party.  Rather, the DRP explicitly describes a cooperative process through which the parties mutually seek informal resolution.

There is nothing unreasonable or impracticable about a mutual obligation to carry out the escalation process.  The purpose of an escalation process such as the DRP is to resolve as many disputes as possible on business terms, leaving only the most intractable and substantive problems for arbitration.  Business solutions by their nature require both parties to engage and compromise.  When one or both parties loses interest in or the ability to reach a business solution, the practical value of the DRP is exhausted – it is no longer a servant of the parties' mutual obligation to work for informal resolution.  Moreover, each party has at all times the practical power to call a time-out if the party feels the informal process has been short-circuited, either before or during arbitration.  Here Tiburon itself initiated the arbitration, evidently believing that the matter was ripe for third party decision.  It would be especially odd to penalize MCD for failing to exhaust informal means when Tiburon actually initiated the arbitration process.  After Tiburon initiated arbitration under the SIA, both parties entered a new private Arbitration Agreement expressing a desire to arbitrate.  Neither party sought a stay of arbitration to return to the DRP.  Under the circumstances, the DRP

had exhausted its purpose, because the parties had mutually agreed by their conduct and their new Arbitration Agreement that it was time to arbitrate.

Moreover, even in a hypothetical case where one party purposely sabotaged a DRP process that the other party genuinely wanted to engage before formal litigation, it would not lead to the result obtained here: namely, a total victory for one party, and a total loss for the other. A breach of the DRP provisions may, in such an extreme hypothetical, justify an award of damages proximately caused by the DRP bypass.[3] But it would not justify an award of one side's full contract claim damages, and a corresponding rejection of all the other side's contract claims. Such a result – the result ordered by the Arbitrator – requires a determination of whether one side or the other breached its substantive obligations under the contract

"By ignoring express and unambiguous contract terms, arbitrators run an especially high risk of being found to have 'exceeded their powers.'" *Gavin*, 331 N.W.2d at 430. By adding words to make the escalation process the obligation of just one party, rather than the mutual obligation the SIA describes; and by treating the DRP not merely as an exhaustion requirement, but as a winner-take-all bet, the Arbitrator exceeded the scope of his authority. Under *Gavin*, vacatur is appropriate. *Id.*

---

[3]An even more natural remedy would be a temporary stay, or a dismissal without prejudice to permit exhaustion of any prerequisites to litigation. This happens in other litigation contexts. *See, e.g., Ravencraft v. UNUM Life Ins. Co. of America*, 212 F.3d 341, 344 (6th Cir. 2000) (directing dismissal of plaintiff's claim under ERISA without prejudice based on failure to pursue administrative remedies); *Boyd v. Corrections Corp. of America*, 380 F.3d 989, 998 (6th Cir. 2004) (affirming dismissal of claims of prisoner-plaintiffs without prejudice for failure to exhaust prison grievance procedures); *Hupka v. Dept. of Defense*, 134 F. Supp. 2d 871, 877 (E.D. Mich. 2001) (dismissing employment discrimination claim without prejudice for failure to exhaust administrative remedies). Failure to exhaust procedural prerequisites, such as the DRP, does not normally result in dismissal with prejudice or forfeiture of substantive rights.

### 2. Section 13 termination is not an exclusive remedy.

Section 13 of the SIA addresses termination routes. Nowhere does the SIA state that Section 13 is the mandatory or exclusive procedure for a party seeking breach of contract damages. Nonetheless, the Arbitrator applied Section 13 as both mandatory and exclusive. Combining that reading with the Arbitrator's construction of the DRP, the arbitration result here amounts to a virtual procedural forfeiture of MCD's claim that Tiburon was in material breach of the SIA – a claim supported by the written admission of Tiburon's own project manager. Nothing on the face of the SIA suggests that the parties bargained for such an all-or-nothing approach, in which the winner would take all without there ever being a ruling on the actual merits of whether Tiburon was in material breach. Moreover, a decision by one party to terminate the contract does not automatically negate all possible bases for contract liability generated before termination. Termination generates one set of potential rights and liabilities for each party, but it does not subsume all other possible claims the contracting parties may have against each other. *See Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 796 (6th Cir. 2003) (parties may invoke independent remedies to the extent not explicitly limited by contract). Termination liability or its absence is just one aspect of the overall contractual rights and liabilities of the parties.

By reading Section 13 as mandatory and exclusive, and as in essence a forfeiture provision, the Arbitrator exceeded the scope of his authority. Under *Gavin*, vacatur is appropriate. *See id.*

### 3. A remand to the same arbitrator is appropriate.

MCD asks the Court to direct that a new arbitrator handle the case following any vacatur. (MCD's Mot. to Vacate Arbitration Award, docket # 35, at 3.) The parties may, of course, choose to select a new arbitrator, to dispense with arbitration altogether, or to settle their differences in any

way they see fit. In the absence of any such agreement by the parties, however, the Court will remand the dispute to the original arbitrator for decision. The Sixth Circuit has noted that remand to an original arbitrator is proper under circumstances similar to those in this case. *See Green v. Ameritech Corp.*, 200 F.3d 967, 976-77 (6th Cir. 2000) ("'[A] remand [to the original arbitrator] is proper . . . to require the arbitrator to address an issue submitted to him but not resolved by the award.'" (quoting *Industrial Mut. Ass'n Inc. v. Amalgamated Workers, Local No.* 383, 725 F.2d 406, 412 n. 3 (6th Cir. 1984))). Similarly, in this case, it is necessary to address issues submitted to the Arbitrator but not resolved. Nothing in this record requires judicial disqualification of the arbitrator. He is already well-acquainted with the factual background of the case. His decisions reflect painstaking attention to detail and careful evaluation of the circumstances of the case. There is no evidence of bias or ill will in his decisions. The Court is vacating the awards the Arbitrator entered against MCD, but an adverse decision alone does not justify remand to a new arbitrator. *Cf. Brown v. Crowley*, 312 F.3d 782, 791-92 (6th Cir. 2002) (detailing factors to consider in determining whether to remand to a different judge); *Armco, Inc. v. United Steelworkers of America, AFL-CIO, Local 169*, 280 F.3d 669, 683 (6th Cir. 2002) (observing that judicial reassignment is an extraordinary remedy to be invoked rarely and with great reluctance) (quotation and citation omitted). Accordingly, the Arbitrator originally selected by the parties is the appropriate person to handle any further arbitration proceedings.

**Conclusion**

This case presents the unusual situation in which vacatur of an arbitration award is appropriate. Accordingly, the Court by separate order will vacate the arbitral decisions on liability,

damages and costs, and remand the dispute for the Arbitrator to consider on the merits following whatever additional evidentiary submissions, briefing and hearing he deems necessary.

Dated:     August 26, 2009               /s/ Robert J. Jonker
                                         ROBERT J. JONKER
                                         UNITED STATES DISTRICT JUDGE